FILED



AO 106 (Rev. 04/10)  Application for a Search Warrant

## UNITED STATES DISTRICT COURT

SEP 21 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

~~Eastern District of California~~

FILED

SEP 19 2018

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

| | |
|---|---|
| In the Matter of the Search of | ) |
| | ) |
| 1514 Yolo Street, Corning, California | ) Case No. 2:18-SW-0677 EFB |
| | ) |
| | ) |

Redacted  **APPLICATION FOR A SEARCH WARRANT**

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-1, attached hereto and incorporated by reference.**

located in the _____ Eastern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a)(1) | Manufacture of Marijuana |
| 21 U.S.C. § § 846 and 841(a)(1) | Conspiracy to Manufacture Marijuana |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Nikolas Roe, Special Agent, U.S. Forest Service
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8-16-2018

*Judge's signature*

City and state:  Sacramento, CA

Edmund F. Brennan, U.S. Magistrate Judge
*Printed name and title*

## <u>AFFIDAVIT OF U.S. FOREST SERVICE SPECIAL AGENT NICKOLAS ROE</u>

I, Nickolas Roe, being duly sworn on oath, depose and say as follows:

## <u>PURPOSE</u>

1.   This Affidavit is made in support of search warrants for:
      a.   1514 Yolo Street, Corning, California, further described in Attachment A-1;
      b.   760 Givens Road, Apartment #15, Red Bluff, California, further described in Attachment A-2;
      c.   A 2006 Lexus sedan, silver in color, bearing California license plate 7NNA919, further described in Attachment A-3;
      d.   A 2011 Honda Accord, black in color, bearing California license plate 7JVP459, further described in Attachment A-4;
      e.   A 2006 Mercedes SUV, silver in color, bearing California license plate 7KVR621, further described in Attachment A-5;
      f.   A 2009 Chevy Silverado pickup truck, white in color, bearing California license plate 8U14540, further described in Attachment A-6; and
      g.   A 2009 Toyota Camry, red in color, bearing California license plate 8CUH181, further described in Attachment A-7.
      h.   The marijuana grow site at the approximate GPS coordinates 40 24.240N 123 7.606W in the Shasta-Trinity National Forest, in Trinity County, California, further described in Attachment A-8.

   I believe there is probable cause to believe that the residences, vehicles, and marijuana grow site described in Attachments A-1 through A-8 contain evidence, fruits, proceeds, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (manufacture of marijuana), and 21 U.S.C. § 846 and 841(a)(1) (conspiracy to manufacture marijuana). The evidence, fruits, and instrumentalities to be searched for and seized are more fully described in Attachment B.

2.   This Affidavit is also made in support of criminal complaints and arrest warrants for the following persons, for violations of 21 U.S.C. § 841(a)(1), Manufacture of Marijuana:
      a.   Fidel SANCHEZ-CRUZ;
      b.   Abraham DE LOS SANTOS-SANCHEZ;
      c.   Nancy EVELIN VILLENA-ARGUELLES; and
      d.   Cornelio CARRAZCO-VALENCIA

## <u>AGENT TRAINING AND EXPERIENCE</u>

3.   I am a Special Agent with the United States Department of Agriculture, Forest Service, Law Enforcement and Investigations. I have been so employed since December 2010. Prior to being a Special Agent, I was a Law Enforcement Officer for approximately four years. I am a "law enforcement officer" "of the United States" within the meaning of 18 U.S.C. § 2510(7) who is empowered by law to conduct investigations of, and to initiate arrests for, various offenses involving

national forest lands, including Title 21 offenses outlawing the manufacture of marijuana.

4. I am a graduate of the Land Management Police Training Program and Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. I also have the arrest powers of a California State Peace Officer, pursuant to Sections 830.8(a) and (b) of the California Penal Code, and have completed the training required by the State of California, pursuant to Penal Code Section 832. All of my training included curriculum focused on controlled substance investigations.

5. My primary duties include detecting, investigating, apprehending, and prosecuting criminal activity associated with controlled substance production and use, on and relating to, National Forest System lands. I have been both the lead and assisting investigator in numerous controlled substance investigations and have arrested/cited dozens of persons for possession, manufacturing, transportation and sales of various controlled substances and illegal drug paraphernalia. While employed as an LEO/Special Agent, I have investigated over 100 large-scale outdoor marijuana grow sites on federal, state, tribal, and private lands. The marijuana grow sites have been in various stages of production. As a result of investigating these marijuana grow sites, I have become very familiar with methods and practices used by the marijuana manufacturers to locate, set up, cultivate, harvest and conceal their marijuana grow sites. I have also become very familiar with methods and practices used to re-supply the grow sites and remove harvested marijuana from the mountains. As a result of these investigations, I have learned that the primary means of communication between the marijuana garden growers and the other members of their marijuana manufacturing organization is by cellular telephone. During the course of these investigations, I have had the opportunity to interview suspects involved in the cultivation and transportation of marijuana for distribution. During these interviews, I have gained knowledge of the methods and practices used to grow and process marijuana, evade detection from law enforcement, communicate with other members of their marijuana manufacturing organization, and transport marijuana and supplies on National Forest lands. I have also observed, at roadside drop points connected by trail to marijuana grow sites, suspects dropping off supplies and personnel to be delivered to the marijuana grow sites. I have also observed processed marijuana that was carried from the marijuana grow site areas being removed by vehicle from roadside drop points. I also have experience detecting marijuana grows through aerial reconnaissance and have spotted numerous marijuana grow sites by air surveillance. I have 11 years of on-the-job training and experience in tracking people through the mountains in a variety of conditions and situations. I have used these skills in search and rescue situations and to detect and track marijuana growers on numerous occasions. I am also responsible for investigating other crimes that occur on USFS land, including arson, resource and property damage and theft.

6. During my career, I have conducted or participated in controlled substance investigations, including conspiracies to manufacture, distribute, and possess with

intent to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and the manufacture, distribution and possession with the intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1). These investigations targeted drug trafficking organizations primarily engaged in the sale, manufacture, importation and distribution of marijuana, which in some instances, also involved cocaine, methamphetamine, and other controlled substances. During the course of my work, I have had the opportunity to converse with numerous law enforcement officers, informants, as well as admitted and known drug traffickers as to the methods and practices, regarding the manufacture, importation, transportation, distribution and sales of controlled substances. I have been the affiant on various federal arrest and search warrants, and have testified in federal Grand Jury in the area of controlled substances.

7. Through prior investigations and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods, language and terms that are used. I am familiar and have participated in various investigative methods including, but not limited to, visual surveillance, interviewing of witnesses, search warrants and use of confidential informants. I have worked joint investigations with various experienced law enforcement officers who are trained in controlled substance investigations and I have drawn from their knowledge and expertise in the field of drug enforcement.

8. Typically, drug traffickers possess firearms and other dangerous weapons to protect themselves and/or their contraband from other criminals who might want to steal the drug traffickers' drug contraband and/or proceeds, and against law enforcement. Based on my training, experience and discussions with other experienced drug agents, I know that firearms are often found at marijuana manufacturing sites on public lands for these purposes.

9. I know that marijuana traffickers often manufacture marijuana on public lands throughout the country, including the Eastern District of California.

10. Based on my training and experience, through discussions with experienced drug investigators and through the information I have learned through investigations, I know that most outdoor live-in marijuana manufacturing operations are generally conducted in a similar manner. Outdoor marijuana manufacturing operations involving large number of marijuana plants require substantial and continual labor to tend to the plants, provide logistical support for the labor force tending to the plants, and provide financial support until proceeds for the processed marijuana are received.

11. Outdoor marijuana manufacturing organizations start exploring and scouting potential cultivation sites in the late winter and early spring. These organizations are normally in search of areas in which the snow melts comparatively early, in close proximity to a viable water supply, and isolated to avoid encounters with recreationalists and other members of the public. Most outdoor marijuana manufacturing organizations desire to plant marijuana plants as early as possible in order to harvest the plants as early as

possible and potentially plant and harvest a second crop for the year before it
becomes too cold in the late fall and early winter. Additionally, during scouting
excursions, these organizations attempt to identify roadside drop points that can be
utilized for the delivery of supplies, equipment and people, which are in close
walking proximity to the cultivators' trail heads and/or cultivation sites. A roadside
drop point is a designated location where the drivers can deliver equipment, supplies
and workers for the cultivations sites. Roadside drop points are normally located
along a rural route so that the cultivation workers can carry the delivered supplies to
the camp area, on the one hand, and the marijuana from the grow site to the roadside
drop point, on the other hand. It is normal for the marijuana manufacturers to
establish a distinct trail system near the roadside drop points. On most occasions,
these organizations favor their roadside drop points to be located in remote areas
where law enforcement and recreational traffic is scarce, in order to avoid detection.

12. Once an outdoor marijuana manufacturing organization identifies possible cultivation
sites, the organization engages in procuring needed supplies to prepare the land, and
locate and develop a water source for the cultivation site. In many cases, fertilizers,
herbicides, pesticides and irrigation equipment are acquired from various vendors, as
well as through illegal sources, such as through smuggled items brought into the
United States.

13. As equipment and supplies for the marijuana grow site are procured, the outdoor
marijuana manufacturing organization starts to deliver items to the area of the
marijuana manufacturing site. Usually, these items are delivered to the pre-designated
roadside drop points.

14. The land is prepared for planting and watering of the marijuana plants. Once a natural
water source is identified and accessed, an irrigation system is constructed. The
natural vegetation is cut, removed or thinned to make space for the marijuana plants.
Usually, locations for one or more live in camps for the marijuana workers is also
established. These camps often have temporary structures, including tents, lean-tos,
and occasionally make-to sheds and similar structures. After the land has been
prepared for planting, the marijuana seeds or cloned marijuana plants are placed into
the ground.

15. Throughout the growing season, which typically lasts between three and six months,
various supplies, equipment and groceries are purchased by or provided by
individuals who deliver the supplies to the grow sites. These individuals are
frequently referred to as "lunch men." The lunch men deliver needed supplies and
workers to the designated roadside drop point. The lunch men also retrieve processed
marijuana from the grow site and pick up workers from the marijuana grow site.

16. As the marijuana plants mature, more workers arrive at the cultivation site(s) to help
with the labor involved in harvesting and processing of the marijuana buds. The
harvested marijuana is laid out to dry in processing areas within the marijuana
manufacturing cultivation site and as it becomes dried, it is packaged and moved to

the roadside drop point for pick up by the drivers for delivery to the distribution centers or to the organization's leadership.

17. Outdoor marijuana manufacturing organizations recently have become more dependent on the use of cellular telephones to facilitate communications in furtherance of their marijuana manufacturing scheme. Cellular telephones are used to communicate among co-conspirators, distributors, purchasers, drivers, the laborers in the grow site, and the organization's leaders. Communications include coordinating the procurement of supplies and equipment and oversight of the progress of the tended to marijuana plants. Some cultivation sites are located in areas where there is no cellular phone service. In these situations, a designated check-in time is established, in which the growers walk to an area where there is cellular service to place their cellular telephone calls.

18. Upon completion of harvesting the marijuana plants, the sites are abandoned, leaving behind materials such as pesticides, herbicides, fertilizers, trash, propane tanks, and food items. The items left behind attract wildlife, such as bears, which attempt to eat the discarded items. The by-products of marijuana manufacturing have the capability of harming the environment and wildlife, and contaminating nearby water sources, such as creeks and streams.

19. My awareness of these drug trafficking practices, as well as my knowledge of marijuana manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:
    a. my training in controlled substance investigations;
    b. my past experience in outdoor marijuana manufacturing investigations;
    c. my involvement in this drug investigation;
    d. what other experienced drug agents have advised me when relating the substance of debriefings of confidential informants and cooperating individuals in prior drug investigations and the results of their own drug investigations; and
    e. other information provided through law enforcement channels.

20. The facts and information set forth in this Affidavit are based upon my personal knowledge and observations, my training and experience, information I have reviewed concerning this investigation, and information and I have received from other law enforcement personnel. Because this affidavit is submitted for the limited purpose of supporting the criminal complaints and securing the requested arrest and search warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the arrest of the individuals named herein, a criminal complaint charging the individuals named herein, and the search and seizure of the properties identified in this Affidavit.

## STATEMENT OF PROBABLE CAUSE

21. On approximately April 20, 2018, U.S. Forest Service Special Agent (SA) Tyler Bolen set up a trail camera on Telephone Ridge Road, also known as Forest Road 30n24. A trail camera is a motion activated camera that takes a photograph each time its motion sensor is activated. Location of the trail camera was about 50 feet north of Highway 36, angled north to view vehicle and pedestrian movements on Telephone Ridge Road. The Telephone Ridge area has a history of illegal marijuana cultivation on U.S. Forest Service lands and is located within Trinity County, in the Shasta-Trinity National Forest, within the Eastern District of California. In 2015, the Telephone Ridge area was inundated with illegal marijuana cultivation consisting of seven large plots with a total of more than 30,000 marijuana plants; five arrests were made in connection with the 2015 cultivation activities.

22. On or about April 25, 2018 at approximately 8:31 a.m., trail camera photographs show a black Honda Accord driving past a surveillance camera, heading north on Telephone Ridge Road. On that same day, at approximately 10:56 a.m., photographs show that same Honda driving back by a surveillance camera heading south towards Highway 36. The camera did not capture the entire license plate but the last number is a 9. It should be noted that between April 20, 2018 and May 6, 2018 (17 days), our surveillance camera captured a total of eight vehicles enter and exit Telephone Ridge. Of those eight vehicles, six of them stayed in the area for five minutes to twenty-two minutes. A black Dodge stayed for thirty-eight minutes. However, the black Honda stayed for two hours and twenty-five minutes. I know from investigating public land marijuana gardens for over ten years that suspects typically have their marijuana cultivation site in place and operational by early spring.

23. On or about May 9, 2018 California Highway Patrol Officer Garrett Snyder (Snyder) conducted a traffic stop on a black, 2011, Honda Accord near the area of Telephone Ridge Rd. The Honda was identical in color, make and model as the one photographed on Telephone Ridge on April 25, 2018. The Honda had a California license plate of 7JVP459. *See* **Attachment A-4**. That Honda is currently registered to [ ] The driver was identified as **FIDEL SANCHEZ-CRUZ** with a date of birth as [ ], and home address of [ ] During the stop, Officer Snyder observed that the vehicle was occupied by only the driver. Inside the vehicle Officer Snyder observed a pair of binoculars, a roll of black trash bags and several money wire transfer receipts sent from Corning, California to Michoacán, Mexico. **SANCHEZ-CRUZ** told Snyder that he was driving to Eureka, California to see the ocean with his binoculars. Snyder took a picture of **SANCHEZ-CRUZ** driver's license (*see* **Attachment C**) and the Honda Accord (*see* **Attachment A-4**).

24. On May 19, 2018, at approximately 1:19 p.m., photographs from a surveillance camera on Telephone Ridge show two Hispanic males walking southbound. One was wearing a camouflage hat, a camouflage long sleeve shirt, jeans, and black shoes. He

was holding a pine tree branch in his right hand and appeared to be attempting to wipe out and conceal his and his associate's footprints. The identity of this suspect (FNU LNU #1) is presently unknown. The other male was wearing a white, blue, and black button down short sleeve shirt, jeans, and desert colored boots, and appeared to be sweating. This suspect was later identified as **ABRAHAM DE LOS SANTOS-SANCHEZ**. The photographs show the two males standing near the camera for about three minutes and looking ahead towards Highway 36.

25. On May 20, 2018, at approximately 8:14 p.m., photographs from a surveillance camera located on Telephone Ridge show a red Toyota Camry, with California license plate 8CUH181 (*see* **Attachment A-7**), traveling north, towards a location near the road that was later identified as a drop point for supplies, as explained below. Photographs show the Camry returning southbound at approximately 8:28 p.m. I ran a registration check on the vehicle, which revealed that the Camry is registered to **NANCY EVELIN VILLENA**, at **760 Givens Road, Apartment 15, Red Bluff, California, 96080** (*see* **Attachment A-2**). The Camry has a vehicle identification number of 4T1BE46K49U315542. At approximately 11:58 p.m. on May 22, 2018, SA Bolen and I conducted surveillance of 760 Givens Road, Apartment 15. While driving by the apartment, I saw the same red Toyota Camry with California license plate 8CUH181 parked in the driveway of Apartment 15. I was unable to obtain a photo because there were people who appeared to be associated with Apartment 15 standing outside next to the red Toyota Camry.

26. On approximately June 3, 2018, Trinity County Sergeant Nate Trujillo and SA Bolen hiked around the Telephone Ridge area in search of evidence of a suspected marijuana cultivation site believed to be somewhere in the area. Photographs from the trail camera had recently shown suspected marijuana growers and activities associated with suspected supply drops. On this day at approximately 8:20 a.m., Sergeant Trujillo and SA Bolen observed a Modelo beer can on the side of Telephone Ridge Road. The can was not discolored or weathered and appeared to have been left there recently. Sergeant Trujillo and SA Bolen looked around the area below this point and spotted a black plastic garbage bag with pine needles partially concealing it. They checked its contents and found it to contain two green duffle bags (army style), a camouflage jacket with orange interior liner, and a greyish hoodie jacket with black interior. Based on Sergeant Trujillo and SA Bolen's training and experience, the location appeared to be a stash point for supplies and other materials—a common tactic used by suspects associated with covertly growing marijuana on national forest lands. At that point, Sergeant Trujillo and SA Bolen returned the stash point to the original state in which they had found it and continued to hike around the area. Several hours later, they located an old marijuana cultivation site on the east side of Telephone Ridge approximately 1/4 mile below the area of the stash point. The site was littered with garbage and black water lines stretched throughout the former marijuana grow. After hiking around the area, they returned to the top. SA Bolen placed a trail camera next to the stash point in order to capture photographs of marijuana growers expected to return to the site. SA Bolen then placed another surveillance camera next to Telephone Ridge Road about 50 feet above the stash

point. Due to the location of the stash point, this appeared to be a likely location where suspect vehicle(s) would stop to deliver supplies. It was far enough from Highway 36 to covertly drop off and pick up supplies and people associated with the marijuana cultivation site suspected to be in the general area.

27. On approximately June 25, 2018, SA Bolen returned to check surveillance images on the three trail cameras. Photographs from the cameras show that on June 7, 2018, at approximately 7:01 a.m., FNU LNU #1, a heavy set Hispanic male with a black beard dressed in camouflage clothing (hat, shirt, pants) and desert army boots, was present at the stash point that Sergeant Trujillo and SA Bolen located approximately four days earlier. FNU LNU #1 was photographed walking with what appeared to be the same green duffle bags that had been concealed in the stash point. The photographs also show him talking on a cell phone. Earlier surveillance photographs show FNU LNU #1 hiking in the area on May 19, 2018, with DE LOS SANTOS-SANCHEZ.

28. Minutes later, at approximately 7:21 a.m. on June 7, 2018, surveillance photographs show a silver Mercedes Benz SUV, with California license plate 7KVR621 (*see* Attachment A-5), park on Telephone Ridge Road directly above the stash point. At that time, FNU LNU #1 can be seen walking out of the vegetated area and approaching the vehicle. Two males, both appearing to be Hispanic, can be seen exiting the vehicle. Based on vehicle stops and photographs I have reviewed the passenger who exited the silver Mercedes is ABRAHAM DE LOS SANTOS-SANCHEZ, the same individual that had been hiking with the heavy set male on May 19, 2018. *See* Attachment C. The photographs show DE LOS SANTOS-SANCHEZ putting on a camouflage long sleeve shirt as soon as he had exited the vehicle. In my experience, suspects who cultivate marijuana on national forest lands often wear camouflage clothing to conceal themselves among the forest vegetation. Surveillance photographs further show the driver of the vehicle, who was wearing a grey and white striped shirt with blue jeans, and the other two suspects unloading supplies from the rear of the vehicle. I compared the driver's license photo that Officer Snyder had taken on May 9, 2018 to photographs captured at the drop point on June 7, 2018. The photographs are consistent and are the same person -- thereby establishing that FIDEL SANCHEZ-CRUZ was the person who drove the silver Mercedes to the marijuana cultivation drop point to deliver supplies on June 7, 2018. *See* Attachment C. All three suspects can be seen unloading the vehicle and walking several large black plastic bags full of unknown items from the vehicle. The photographs indicate that the supplies were being set down in the brushy vegetated area below the road and out of sight. More specifically, SANCHEZ-CRUZ can be seen unloading two large black plastic bags, a white cardboard box (possibly a large box of eggs) and a case of Orange or Red Crush soda. SANCHEZ-CRUZ also can be seen handing FNU LNU #1 two sets of picks (digging tools), tools that I have observed at numerous marijuana cultivation sites. DE LOS SANTOS-SANCHEZ can be seen unloading a third black plastic bag full of unknown items. FNU LNU #1 can be seen with green duffle bags and also grabbing a pair of desert work boots from the rear of the vehicle. At approximately 7:29 a.m., about eight minutes after arriving, the vehicle can be seen departing. Photographs reveal that the passenger DE LOS

SANTOS-SANCHEZ stayed behind in the forest with FNU LNU #1while
SANCHEZ-CRUZ departed in the vehicle.

29. A records check revealed that the silver Mercedes (7KVR621) is listed as a 2006
Mercedes Benz SUV registered to ░░░░░░░░░░░░░░░░░░░░░░░░░░░░░░
░░░░░░░░░░░░ On July 1, 2018, at approximately 2:31 p.m., SA Bolen and I
conducted surveillance of ░░░░░░░░░░░░░░░ and did not witness any
vehicles in the driveway. However, that residence has an attached two-car garage
which could have concealed the vehicle from our view.

30. On surveillance photographs from June 16, 2018, at approximately 4:12 p.m., one of
the suspects is partially visible standing near a surveillance camera located on
Telephone Ridge about 100 yards south of the drop point (closer to Highway 36). He
is pictured wearing a blue American Eagle shirt and blue jeans. He appears to be DE
LOS SANTOS-SANCHEZ, the same suspect that was a passenger in the Mercedes
SUV and subsequently dropped off with supplies on June 7, 2018 at approximately
7:21 a.m.

31. Surveillance photographs from June 23, 2018, at approximately 5:35 p.m., show two
suspects emerge from the forest at the drop point. The suspects appear to be the same
two suspects previously photographed on multiple days. The heavy set male (FNU
LNU #1) was dressed in full camouflage and the second male suspect appears to be
DE LOS SANTOS-SANCHEZ. DE LOS SANTOS-SANCHEZ was wearing a
camouflage shirt and blue jeans. For approximately the next 31 minutes they are
photographed walking around the drop point and appear to be looking around for
something and paying close attention towards the north where vehicles enter the area
from Highway 36. Based on my experience, the suspects were looking for
surveillance equipment at the drop point while conducting their own surveillance to
ensure nobody would witness them at the drop point. At approximately 6:06 p.m.,
photographs show them motioning towards the stash point located below the drop
point. At approximately 6:19 p.m., a silver Lexus sedan displaying California license
plate 7NNA919 (see Attachment A-3) can be seen driving past the drop point.
Minutes later, at approximately 6:25 p.m., the two suspects again emerge back on to
the road at the drop point and can be seen looking in the direction that the Lexus had
driven. I have witnessed numerous supply drops while conducting surveillance from
the bushes of known drop points. A common tactic for suspects receiving a supply
drop is to let the drop vehicle pass by their concealed location. After the suspects
confirm the vehicle to be their supply drop vehicle, they emerge from their
concealment and contact the vehicle. Additionally, the Lexus could only drive about
100 yards further as the road dead ends and becomes impassable for a low clearance
sedan to proceed any further. After the Lexus passed by, photographs show FNU
LNU #1 walking towards the location that the Lexus had driven while DE LOS
SANTOS-SANCHEZ stays at the drop point and appears to conduct surveillance,
paying close attention to the north towards Highway 36. DE LOS SANTOS-
SANCHEZ then walks south on the road in the direction that the Lexus had driven. It
should be noted that this section of Highway 36 is remote, and often times has no

traffic. Furthermore, from the suspects' position, it is possible to hear a vehicle traveling on Highway 36 for at least a couple miles in either direction. At approximately 6:31 p.m., about six minutes after the suspects can be seen emerging from the forest, photographs show the Lexus pass back by the drop point towards Highway 36. In my experience, supply drops happen quickly, generally taking approximately five minutes or less. The drop vehicle enters the drop point location, suspects emerge from their concealed location, approach the vehicle and very quickly unload their supplies, and the vehicle leaves. The suspects are not photographed coming back to the drop point that day. Based on the images and my experience, I strongly believe DE LOS SANTOS-SANCHEZ, FNU LNU #1, and the Lexus are associated. The Lexus is registered to [ ] at 1514 Yolo St. Corning, California 96021 (see Attachment A-1).

32. On June 25, 2018, at approximately 2:32 p.m., the silver Mercedes is photographed returning to the drop point. Surveillance images show the front seat passenger immediately exit the vehicle upon parking and begin unloading supplies from the vehicle, including loaded bags and a case of Sprite soda. He was wearing a light colored baseball hat with the brand "Hurley" insignia in black on the front of the hat, blue t-shirt with "CK", and blue jeans. He matches the description of the suspect consistently seen with FNU LNU #1 and appears to be DE LOS SANTOS-SANCHEZ. Additionally, I found a Facebook profile for "De Los Santos Mich" who appears to be the same person as DE LOS SANTOS-SANCHEZ who upload a selfie wearing what appears to be the same "Hurley" baseball hat. Photographs show that, while DE LOS SANTOS- SANCHEZ was unloading supplies, FNU LNU #1, dressed in camouflage, emerged from the forest with green duffle bags. FNU LNU #1 can be seen removing a white 20 lb. propane tank from his green duffle bag and placing it into the back passenger seat of vehicle. Photographs show him talking to the driver, who remains in the vehicle and, hence, is not photographed. An unidentified heavy set female, appearing to be Hispanic, can be seen exiting from the rear driver side seat and walking around the front of the vehicle. She was wearing a tight pink miniskirt and had long pinkish/red hair with some brown or black hair showing closer to her scalp. The suspect who exited from the front seat DE LOS SANTOS-SANCHEZ is then photographed pulling a camouflage shirt on. DE LOS SANTOS-SANCHEZ and FNU LNU #1 are then photographed walking away from the vehicle towards the marijuana cultivation site with the supplies. At the same time, the Mercedes can be seen departing the area back towards Highway 36 at approximately 2:34 p.m. Surveillance images show the suspects' actions at the drop point lasted approximately two minutes.

33. On July 1, 2018, SA Bolen and I went to Telephone Ridge to check the cameras and conduct foot reconnaissance. At approximately 9:30 a.m., I observed a foot trail in the forest vegetation. The trail appeared to have been used recently because as I walked on it, I noticed there were no crunching sounds coming from the forest vegetation on the ground and that the vegetation had been previously compacted, apparently by other humans. The human trail continued for only about 30 yards, passed through a small drainage with flowing water, and ended at the bottom of an old marijuana

cultivation site. Additionally, I observed waterline and holes (tilled dirt) with old cut stalks of marijuana from what appeared to be last year's marijuana cultivation site. Furthermore, I witnessed large amounts of trash that appeared to be from last year. I also observed trash that appeared to be from this year. While standing near the trash pile I noticed a large number of mosquitoes in the area, which led me to believe the trash had been discarded within the last couple of weeks. I then walked up the hill from the trash pile through last year's marijuana cultivation site. I hiked approximately 30 yards up the hillside where I witnessed hundreds of marijuana plants that appeared to be one to two feet tall at approximate **GPS CORDINATES 40 24.240N 123 7.606W** (*see* **Attachment A-8**). I then turned around and hiked back down to the foot trail, through the small drainage with flowing water. In the drainage I witnessed what appeared to be another human-caused foot trail, paralleling the drainage and leading uphill towards an area where I had observed additional marijuana plants. I did not follow this trail because it was too close to the marijuana cultivation site and I believe it may lead to the suspects' camp. I continued past the drainage for about 30 yards and hiked back to my vehicle on an old skid road that led to the top of Telephone Ridge. I estimate that I observed well over a thousand marijuana plants growing in the area during my reconnaissance that day. On that same day, at approximately 1:15 p.m., SA Bolen and I traveled to 1514 Yolo Street, Corning, California and witnessed the same black Honda (7JVP459) that Officer Snyder had stopped on May 9, 2018, parked in the driveway. I also witnessed the same silver Lexus (7NNA919) that went to Telephone Ridge on June 23, 2018, parked behind the Honda. Furthermore a 2009 Chevy Silverado, white in color, bearing California 8U14540 (*see* **Attachment A-6**) was parked behind the Lexus.

34. On July 2, 2018, at approximately 1:27 p.m., one of the trail cameras at the drop point captured a photograph of **DE LOS SANTOS-SANCHEZ**, wearing a navy blue "CK" t-shirt and blue jeans, walking towards Highway 36. On the same day, at approximately 1:54 p.m., a camera located near the intersection of Highway 36 and Telephone Ridge Road captured the same skinny Hispanic male walking towards Highway 36, with a big smile on his face. At approximately 2:00 p.m., the red Toyota Camry with license plate 8CUH181 can be seen driving past the camera near the intersection of Highway 36 and Telephone Ridge Road. Based on my training and experience, I believe the red Toyota Camry picked up **DE LOS SANTOS-SANCHEZ** and then departed the area. It should be noted that Telephone Ridge Road is not near a river or a developed camping area. It is not a place where people recreate or gather firewood. To drive from Red Bluff to the Telephone Ridge area takes approximately one hour and fifteen minutes and covers a distance of approximately 72 miles.

35. On July 4, 2018, U.S. Forest Service Law Enforcement Officers Donald Kidd and Victor Morales were conducting surveillance at 1514 Yolo Street, Corning, California and witnessed that same silver Lexus parked in the driveway. Also parked in the driveway in front of the silver Lexus was a black Honda Accord.

36. On July 6, 2018, United States Magistrate Judge Carolyn K. Delaney, Eastern District of California, authorized law enforcement to install and monitor a tracking device on the red Toyota Camry (8CUH181), the silver Lexus (7NNA919), and the silver Mercedes SUV (7KVR621). *See In the Matter of the Tracking of a Red Toyota Camry, etc.* 2:18-SW-0556-CKD (E.D. Cal.) (under seal); *In the Matter of the Tracking of a Silver Mercedes-Benz Sport Utility Vehicle, etc.* 2:18-SW-0557-CKD (E.D. Cal.) (under seal); *In the Matter of the Tracking of a Silver Lexus Sedan, etc.* 2:18-SW-0555-CKD (E.D. Cal.) (under seal).

37. On July 8, 2018 at approximately 11:58 p.m., I installed a tracking device on the silver Lexus while it was parked in the driveway at 1514 Yolo Street, Corning, California. At that time, I witnessed the black Honda (7JVP459) that **FIDEL SANCHEZ-CRUZ** was stopped in on May 9, 2018 near Telephone Ridge, parked in front of the silver Lexus.

38. On July 9, 2018 at approximately 1:38 a.m., I installed a tracking device on the red Toyota Camry while it was parked in the driveway located at 760 Givens Road, Apartment 15, Red Bluff, California. I was unable to install a tracking device on the Mercedes SUV.

39. On or about July 13, 2018 at approximately 3:49 p.m., a surveillance camera placed on Telephone Ridge approximately twenty-five yards from the intersection of Highway 36 and Telephone Ridge captured pictures of a red Toyota Camry, bearing California license plate 8CUH181. It is the same red Toyota Camry that was photographed on July 2, 2018. The camera took several photographs in rapid succession that show a suspect walking towards the Camry as the Camry passes by the camera. Surveillance photographs show the Camry leaving the Telephone Ridge area about one minute after arriving, at approximately 3:50 p.m. On that same day, at approximately 4:58 p.m., California Highway Patrol Officer Dirk Lambert (badge #14509) conducted a traffic stop on the Camry for speeding. Officer Lambert told me the Camry was travelling 64 miles per hour in a 55 mile per hour zone. The Camry was occupied by two people. The driver was identified by her California driver's license as **NANCY EVELIN VILLENA-ARGUELLES** with a date of birth of ▨▨▨▨▨. The passenger was identified by his Mexican Electoral Card as **ABRAHAM DE LOS SANTOS-SANCHEZ** with a date of birth of ▨▨▨▨▨. The vehicle was followed straight to Walmart in Red Bluff. At approximately 5:30 p.m., **VILLENA-ARGUELLES** and **DE LOS SANTOS-SANCHEZ** were observed walking into Walmart. I walked into Walmart and observed **DE LOS SANTOS-SANCHEZ** wearing blue jeans and the same navy blue T-shirt with the white letters "CK" on the front that was photographed by surveillance cameras on Telephone Ridge on July 2, 2018. At approximately 6:18 p.m., **VILLENA-ARGUELLES** and **DE LOS SANTOS-SANCHEZ** were observed leaving Walmart and travelling to 760 Givens Road, Apartment 15, arriving at approximately 6:25 p.m.

40. On or about July 14, 2018, at approximately 9:39 a.m., I witnessed the red Toyota Camry parked near a taco truck east of California State Highway 99. Parked at that

same general area was a Chevy Silverado, white in color, bearing California license
plate 8U14540. It is the same Chevy Silverado that I have witnessed at 1514 Yolo
Street, Corning, California. On that same day, at approximately 10:23 a.m., I
witnessed DE LOS SANTOS-SANCHEZ leaning against the Chevy Silverado
talking with FIDEL SANCHEZ-CRUZ. At approximately 10:30 a.m., I saw DE
LOS SANTOS-SANCHEZ and SANCHEZ-CRUZ leave together in the Chevy
Silverado driving past my location. On that same day, at approximately 11:30 a.m.,
U.S. Forest Service Law Enforcement Officer Christopher Sakraida witnessed that
same Chevy Silverado, drive into the driveway of 1514 Yolo Street and park.
Moments later, Officer Sakraida observed DE LOS SANTOS-SANCHEZ unload
two large heavy bags from the bed of the Chevy Silverado. The large heavy bags
appeared to Officer Sakraida to be 50-pound fertilizer bags.

41. On or about July 15, 2018, at approximately 10:39 a.m., I observed DE LOS
SANTOS-SANCHEZ and VILLENA-ARGUELLES arrive at 1514 Yolo Street,
Corning, California. Both suspects exited the red Toyota Camry (8CUH181). DE
LOS SANTOS-SANCHEZ was wearing a "Hurley" baseball hat, red shirt, gold
chain necklace around his neck, and dark colored jeans. VILLENA-ARGUELLES
was wearing a maroon colored shirt. DE LOS SANTOS-SANCHEZ began
unloading items from the trunk of the Camry and he and VILLENA-ARGUELLES
walked into the residence located at 1514 Yolo Street. On that same day, at
approximately 12:50 p.m., DE LOS SANTOS-SANCHEZ updated his Facebook
account with a profile picture of his right side. The picture shows DE LOS
SANTOS-SANCHEZ outside near a water hose, wearing a baseball hat, sunglasses,
red t-shirt and dark colored jeans. In the picture, DE LOS SANTOS-SANCHEZ is
displaying a handgun secured to his right hip and his right hand has his index and
middle fingers extended in what appears to be a sideways "peace" sign. According to
the vehicle stop report, the Camry was parked near 1514 Yolo Street from
approximately 12:25 p.m. to approximately 3:47 p.m.

42. On or about July 16, 2018, at approximately 7:12 a.m., a surveillance camera
captured pictures of VILLENA-ARGUELLES's red Toyota Camry, entering
Telephone Ridge. On that same day, at approximately 7:19 a.m., that same
surveillance camera shows the Camry leaving Telephone Ridge. On that same day, at
approximately 8:18 a.m., California Highway Patrol Officer Szychulda (badge
#15564) conducted a traffic stop on the Camry for speeding. Officer Szychulda told
me the Camry was travelling 68 miles per hour in a 55 mile per hour zone. The
Camry was occupied by a single occupant and she was identified by her California
driver's license as NANCY EVELIN VILLENA-ARGUELLES with a date of birth
of [                    ].

43. On or about July 29, 2018, at approximately 11:38 a.m., a surveillance camera located
at the drop point, approximately one hundred yards from the intersection of Highway
36 and Telephone Ridge, captured pictures of VILLENA-ARGUELLES's red
Toyota Camry parked at the drop point, facing north towards the marijuana
cultivation site. Surveillance cameras captured pictures of DE LOS SANTOS-

SANCHEZ carrying plastic bags filled with items into the bushes. On that same day, at approximately 11:49 a.m., surveillance photographs show DE LOS SANTOS-SANCHEZ and VILLENA-ARGUELLES walking on Telephone Ridge at the drop point. Both suspects are carrying the plastic bags that had recently been unloaded from VILLENA-ARGUELLES red Toyota Camry. Furthermore, DE LOS SANTOS-SANCHEZ and VILLENA-ARGUELLES appear to be holding hands as they walk towards the marijuana cultivation site. On that same day, at approximately 11:50 a.m., a surveillance camera located approximately one hundred and forty yards from the intersection of Highway 36 and Telephone Ridge captured a photograph of VILLENA-ARGUELLES, dressed in all black, carrying at least two plastic bags in her right hand walking towards the marijuana cultivation site. On that same day, at approximately 6:39 p.m., a surveillance camera captured DE LOS SANTOS-SANCHEZ and VILLENA-ARGUELLES walking away from the marijuana cultivation site wearing what appear to be the same clothes. Neither DE LOS SANTOS-SANCHEZ nor VILLENA-ARGUELLES were carrying any plastic bags.

44. On or about July 31, 2018, I drove to Telephone Ridge to check surveillance cameras and conduct surveillance utilizing a spotting scope. At approximately 10:17 a.m., I witnessed a suspect wearing a blue shirt with long gray sleeves and a light colored hat walking in the marijuana cultivation site. The shirt he was wearing was extremely odd to me because it offered no concealment and was readily visible when surrounded by forest vegetation. The suspect appeared to be inspecting the marijuana plants by looking at the plants and touching them with his hands. I observed the suspect for approximately one minute before he moved into some trees that obstructed my view. At approximately 10:40 a.m., I serviced surveillance cameras on Telephone Ridge by changing out memory cards. At approximately 11:02 a.m., I was parked in my unmarked police vehicle on Telephone Ridge reviewing photos of images the surveillance cameras had captured. While reviewing surveillance photos I discovered that on July 31, 2018 at approximately 9:22 a.m., the silver Mercedes (7KVR621) travelled past surveillance cameras towards the marijuana cultivation site. The passenger front window was down. In the front passenger seat was a Hispanic male, wearing a white t-shirt, who was later identified by his Washington identification card as CORNELIO CARRAZCO-VALENCIA, with a date of birth of [REDACTED]. See Attachment C. At approximately 9:23 a.m., the same silver Mercedes parked at the drop point. At approximately 9:24 a.m., the passenger and rear cargo doors were opened. CARRAZCO-VALENCIA exited the silver Mercedes wearing a plain white t-shirt and blue jeans. The surveillance photographs show CARRAZCO-VALENCIA looking down at the ground and up in the trees before walking to the rear of the silver Mercedes. I believe CARRAZCO-VALENCIA was looking for surveillance equipment commonly used by law enforcement. At approximately 9:26 a.m., pictures reveal a suspect walking towards the marijuana cultivation site carrying a large green duffel bag that appears to be packed with items. The suspect appears to be the same heavy set Hispanic male (FNU LNU #1) that surveillance cameras had captured numerous times with DE LOS SANTOS-SANCHEZ. At approximately 9:27 a.m. pictures show a different suspect

later identified as **FIDEL SANCHEZ-CRUZ** running towards the marijuana
cultivation site carrying a large box under his left arm. **SANCHEZ-CRUZ** was
wearing a light colored hat, a blue shirt with long gray sleeves, and blue jeans.
**SANCHEZ-CRUZ** was wearing identical clothing as the suspect I observed
inspecting the marijuana plants in the cultivation site at approximately 10:17 a.m.

45. On that same day, at approximately 9:28 a.m., a surveillance camera captured a
picture of that same silver Mercedes (7KVR621) traveling towards Highway 36. On
that same day, at approximately 11:16 a.m., that same silver Mercedes drove by my
vehicle traveling north on Telephone Ridge towards the drop point. There was one
occupant driving the silver Mercedes and it was **CARRAZCO-VALENCIA.** He was
wearing a white t-shirt. I observed the silver Mercedes drive to the drop point, turn
around and stop at the drop point facing towards me. At approximately 11:22 a.m., I
exited Telephone Ridge and traveled east on Highway 36 for approximately four
miles. At that location, at approximately 11:53 a.m., the same silver Mercedes passed
by my location with **CARRAZCO-VALENCIA** driving, wearing the white t-shirt,
with **SANCHEZ-CRUZ** in the passenger seat. At approximately 12:04 p.m., I
contacted California Highway Patrol Dispatch and requested a stop on the silver
Mercedes if the Officer had probable cause. At approximately 1:39 p.m., I received a
phone call from California Highway Patrol Officer Tawney badge #19792. Officer
Tawney informed me that he had stopped the silver Mercedes at 12:50 p.m., and
issued a citation to the driver for following too close. Additionally, Officer Tawney
informed me that the silver Mercedes was occupied by two subjects. The driver was
identified by his Washington identification card as **CORNELIO CARRAZCO-
VALENCIA**, with a date of birth of ░░░░░░░. The passenger was identified by his
Mexico identification card as **FIDEL SANCHEZ-CRUZ**, with a date of birth of ░░
░░░░░. Furthermore, Officer Tawney informed me that the silver Mercedes is
registered to Manjeet Virdi at 770 Jacquelyn Street, Orland, California. However, the
Mercedes is insured by Farmers Insurance Company and lists **FIDEL SANCHEZ-
CRUZ**, at 1514 Yolo Street, Corning, California as the policy holder for that
Mercedes. Officer Tawney told me he questioned **SANCHEZ-CRUZ** as to why he
pays for insurance for a vehicle that is not in his name. **SANCHEZ-CRUZ** stated he
had not filed the registration information with the Department of Motor Vehicles yet,
but had the paperwork at his house. On that same day, SA Bolen was waiting for
that silver Mercedes near the intersection of Highway 36 and Main Street Red Bluff
just after it had been stopped by Officer Tawney. SA Bolen was able to follow that
silver Mercedes from Main Street, Red Bluff, directly to 1514 Yolo Street, Corning,
California where he observed **CORNELIO CARRAZCO-VALENCIA** and
**SANCHEZ-CRUZ** exit the silver Mercedes and walk into the residence at
approximately 1:47 p.m. SA Bolen terminated surveillance at approximately 2:00
p.m.

46. On or about August 1, 2018 at approximately 3:50 p.m., I traveled to Telephone
Ridge and serviced surveillance cameras. On or about August 2, 2018 I reviewed
photographs that my surveillance cameras had captured between July 31, 2018 and
August 1, 2018. These photographs showed that, on July 31, 2018 at approximately

11:17 a.m., the same silver Mercedes (7KVR621) travelled towards the marijuana cultivation site. At approximately 11:19 a.m., a surveillance camera captured a picture of the silver Mercedes at the drop point. By this time the Mercedes had turned around and was facing towards Highway 36, parked at the drop point. Also, at approximately 11:19 a.m., the driver, **CARRAZCO-VILENCIA**, was standing outside the vehicle with the driver's side door opened, looking towards Highway 36 at the location I was parked. Several pictures are captured by the surveillance camera between 11:19 a.m., and 11:22 a.m. The pictures show **CARRAZCO-VALENCIA** walking by the Mercedes, apparently maintaining counter-surveillance on the location where I was parked. At approximately 11:22 a.m., the surveillance camera captured a picture of **CARRAZCO-VALENCIA** driving the Mercedes towards Highway 36. It was approximately 11:22 when I exited Telephone Ridge on that day, July 31, 2018. Between approximately 11:23 a.m. and 11:33 a.m., multiple cameras captured pictures of the Mercedes traveling back and forth on Telephone Ridge road. At approximately 11:34 a.m., the surveillance camera located closest to Highway 36 captured the silver Mercedes traveling in reverse towards the drop point. I believe **CARRAZCO-VALENCIA** was likely parked in between my surveillance cameras for approximately ten minutes to block any traffic from going towards the drop point. At approximately 11:44 a.m., a surveillance camera captured pictures of the Mercedes traveling in reverse and parking at the drop point. The photographs clearly show **CARRAZCO-VALENCIA** sitting in the driver's seat from approximately 11:44 a.m. to 11:46 a.m., when the Mercedes left Telephone Ridge.

47. It is my experience that suspects who cultivate marijuana do not like to park their vehicles near their marijuana cultivation site because it exposes them and their vehicles to being connected to the illegal manufacturing of marijuana on public lands. It is also my experience that the photographs captured by my surveillance cameras of the behaviors that **CARRAZCO-VALENCIA** exhibited were consistent with someone who knew they were helping to further the crime of cultivating marijuana on public lands. **CARRAZCO-VALENCIA** rode to Telephone Ridge in the silver Mercedes. **CARRAZCO-VALENCIA** and **SANCHEZ-CRUZ** delivered supplies to at least one suspect who I recognize consistently getting supplies from June to August. **CARRAZCO-VALENCIA** left Telephone Ridge for almost two hours while **SANCHEZ-CRUZ** went into the marijuana cultivation site to ensure the Mercedes would not remain parked near the marijuana cultivation site. After returning to Telephone Ridge I witnessed **CARRAZCO-VALENCIA** turn around at the drop point, even though Telephone Ridge Road continues for approximately one hundred yards. **CARRAZCO-VALENCIA** apparently knew **SANCHEZ-CRUZ** needed to be picked up. After picking up **SANCHEZ-CRUZ**, **CARRAZCO-VALENCIA** drove the Mercedes back to 1514 Yolo Street, Corning, California.

48. On or about August 7, 2018 Officer Tawney reviewed a photograph that had been taken from my surveillance camera on July 31, 2018 showing a Hispanic male wearing a light colored hat, a blue shirt with long gray sleeves, and blue jeans. Officer Tawney told me the passenger in the silver Mercedes, **FIDEL SANCHEZ-CRUZ**, was wearing that same shirt during the July 31, 2018 traffic stop.

## AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED

49. Based on my training and experience, and consultations with other federal, state, and local law enforcement personnel, I believe the following to be true:

50. Marijuana cultivation operations are usually continuous, ongoing endeavors. I know that people involved in marijuana cultivation operations often maintain evidence of marijuana cultivation on their person (e.g., their cellular telephone or clothing), at their residence (evidence of involvement in marijuana growing operations), and in their vehicles (same).

51. Marijuana manufacturers use an assortment of equipment to plant and maintain their product. This equipment includes, but is not limited to, irrigation devices, garden hoses, five gallon buckets, ground timing devices, electronic watering devices, aerators, PVC pipes, water storage devices, lights, timers, power cords, generators, shovels, rakes, pruning shears, hand-held sprayers, herbicides, starter pots, planter pots, grow pots, paper bags, burlap bags and plastic storage containers.

52. Marijuana manufacturers also use an assortment of equipment for the use, storage, processing and packaging of marijuana, including rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales, and other weighing devices, drying screens, pouches, backpacks, plastic storage containers, surveillance/monitoring devices, and alarm sensors. Marijuana manufacturers will commonly package their product where it is produced and also at their residences. With respect to marijuana, this packaging could include, but is not limited to, scales to weigh the marijuana, plastic baggies, large plastic garbage bags, boxes, buckets, and heat sealers to package the marijuana for sale. This equipment is commonly kept on the property, including inside structures on the property near where the marijuana is kept or is being cultivated.

53. I know that marijuana manufacturers are often involved in in the distribution of marijuana, as well as the distribution of other illegal narcotics.

54. Individuals involved in marijuana distribution often maintain paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying strains of marijuana. Marijuana manufacturers and traffickers will generally keep a supply of marijuana on hand for immediate sale. The drugs are commonly kept on their person and in locations associated with the traffickers, including in the home or in the vehicles of, or used by, the manufacturers. Manufacturers will often hide their supply of marijuana in garages, vehicles, outbuildings, storage areas, and/or sheds associated with or near their residence and/or cultivation facility, or in yard areas surrounding such premises, otherwise attempting to conceal its presence.

55. Marijuana manufacturers often use vehicles to transport marijuana, equipment, and supplies for the cultivation and distribution of marijuana to and from the cultivation

site, as well as to and from the conspirators' residences, including their garages and outbuildings, such as sheds or barns.

56. The parcels of property on which marijuana manufacturers maintain cultivation facilities are often listed under fictitious names instead of the true names of the manufacturers. Conspirators in marijuana cultivation who have multiple cultivation facilities typically keep evidence of the location and ownership of such property at the cultivation sites (including inside buildings or other outlying structures on the sites), on their persons, in vehicles, or at their residences, including personal letters and notes, phone bills, loan payment receipts, utility bills, rental agreements and documents, deeds, canceled mail, canceled checks, envelopes, keys, photographs, audio and video tapes, property tax records, escrow documents, assessor's information, payment records and receipts for method of payment, and other indicia of occupancy, residency, control, or ownership of the premises and things described in this warrant.

57. Marijuana manufacturers often maintain at their residence personal records and ledgers evidencing their activities in order to keep track of the ordering, purchasing, storage, distribution, and transportation of marijuana. Even after the marijuana is cultivated and sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. These records are often maintained not only on paper, but also as computer data in the form of computer hardware and software.

58. Marijuana manufacturers earn sums of money and often try to legitimize these profits. In order to do this, they attempt to secure, transfer, and conceal the money by, (among other methods): (a) placing assets in names other than their own name to avoid detection while maintaining control; (b) laundering the money through what appear to be a legitimate business or businesses; (c) hiding the money in their homes, safes, and safety deposit boxes; or (d) using the money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found at their residence, in their vehicles, and on their persons.

59. Marijuana manufacturers often maintain large amounts of U.S. currency on hand in order to finance their ongoing drug business. In addition, other assets generated by their drug business, are purchased with cash earned, such as precious metals, and stones, and jewelry, are typically kept by marijuana manufacturers at their residence, in their vehicles, and on their persons to avoid detection by authorities.

60. Marijuana manufacturers often maintain weapons, firearms, and ammunition on their person or at their residences and in their automobiles in order to protect themselves and guard their drugs and drug profits. These weapons and firearms are used and can be used as an instrumentality of the object of their crimes.

61. Marijuana manufacturers often take, or cause to be taken, photographs of themselves, their associates, their property, and their marijuana plants, and usually maintain these photographs in their possession.

62. I know that those involved in the growing and distributing of marijuana use mobile telephones to communicate with customers, suppliers and co-conspirators. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other co-conspirators and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile phones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information. The information stored in a telephone used by a marijuana cultivator is evidence of the associations of the marijuana cultivator, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a marijuana cultivator's mobile telephone can contain evidence of their illegal activities because it shows the communications or planned communications of a marijuana cultivator and the telephone numbers of those with whom the marijuana cultivator communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crimes. Mobile telephones can also contain photographic data files, which can contain evidence of criminal activity; for example, where the user is a marijuana cultivator who took pictures of his/her plants and/or grow site. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

## REQUEST TO SEAL

63. This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants and arrest warrants. In light of the on-going nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, your Affiant requests that this Affidavit and the resulting Search Warrants and Arrest Warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the Search Warrant and an inventory

of any items seized that will be left at the locations of the execution of the Search Warrants.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Nickolas Roe
Special Agent, U.S. Forest Service

Subscribed and sworn to before me on this /6 th day of August, 2018.

The Honorable Edmund F. Brennan
United States Magistrate Judge

Approved as to form:

David W. Spencer
Assistant U.S. Attorney

# ATTACHMENT A

Mercedes at drop point on June 7, 2018 at approximately 7:21 a.m.   The photo clearly shows the license plate as California 7KVR621.  Additionally, there is a suspect standing to the left of the Mercedes wearing camouflage clothing.



# ATTACHMENT B

Lexus traveling past the drop point on June 23, 2018 at approximately 6:19 p.m.  On that same day at approximately 6:06 p.m., the same camera captured photos of two suspects walking on the road down to the staging area where they have previously cached supplies.  The picture of the license plate is blurry, but I had another camera that captured the license plate on June 23, 2018 at approximately 6:16 p.m.



Picture of the California license plate bearing 7NNA919. This picture was taken at Telephone Ridge Road on June 23, 2018 at approximately 6:16 p.m.



# ATTACHMENT C

Toyota Camry traveling by camera on Telephone Ridge on July 2, 2018 at approximately 2:00 p.m.  On this same day at approximately 1:54 p.m., the same camera captured a photo of a suspect walking towards the camera with a big smile on his face.  Toyota has a California license plate of 8CUH181.





## **ATTACHMENT A-1**

<u>Location to be Searched:</u> **1514 Yolo Street, Corning California,** is a single story residence located north of Yolo Street, in Corning California. The residence is white in color with gray trim. There are four steps leading up to a covered front porch. There are two windows on the front of the house to the west and east of the front porch. Located on the header of the covered porch are the numbers 1514 that are white in color with a black boarder. To the west of the residence is a driveway that is approximately the width of a single vehicle. The driveway continues north past the front porch to a second covered porch, located towards the northwest side of the residence. There is a sidewalk located south of the residence that ends at the southwest corner of the property. Additionally, there is a black mailbox with a white post located in the front yard, north of the sidewalk.

The search of the aforementioned location shall include:

ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage, and any vehicles parked on the premises and/or in the possession and/or control of Fidel SANCHEZ-CRUZ, Abraham DE LOS SANTOS-SANCHEZ, Nancy EVELIN VILLENA-ARGUELLES, Cornelio CARRAZCO-VALENCIA, or the residents, as evidenced by their possession of keys and/or registration documents, at the time of the execution of the search warrant.





# **ATTACHMENT A-2**

**Location to be Searched: 760 Givens Road, Apartment #15, Red Bluff, California,** is an apartment located north of Givens Road on a narrow driveway that dead ends. There are a total of 10 apartment buildings located west and east of the driveway. When you turn north off of Givens Road on to the driveway you will see the numbers 760 on Apartment #2, located to the east. Apartment #15 is the fourth building north of Givens Road on the west side of the driveway, marked with a yellow tack on the second photo. Apartment #15 is a single story building with cream colored Stucco and white trim. The front of the residence has large windows that are partially blocked by a large rose bush with pink roses and green leaves north of the front door. The front door is white in color with a nickel finished round door knob. A large number 15 in black color is located on the front door. There is an outside light mounted slightly north of the front door. On the north side of the residence is a second door. A small number 15 in black color is located on the door. The door is white in color with an outside light mounted slightly east of the door.

The search of the aforementioned location shall include:

ANY AND ALL attachments, to include attics, basements, garages, safes, carports, outbuildings, trailers, appurtenances thereto, and all other areas within the curtilage, and any vehicles parked on the premises and/or in the possession and/or control of Fidel SANCHEZ-CRUZ, Abraham DE LOS SANTOS-SANCHEZ, Nancy EVELIN VILLENA-ARGUELLES, Cornelio CARRAZCO-VALENCIA, or the residents, as evidenced by their possession of keys and/or registration documents, at the time of the execution of the search warrant.



Google Earth image of apartment #15, 760 Givens Road, Red Bluff, California. The yellow tack is the physical location of the residence to be searched. The red tear drop with the black circle in the middle is the location where the numbers 760 are posted.



Front door, apartment #15, 760 Givens Road, Red Bluff, California.



Side door of apartment #15, 760 Givens Road, Red Bluff, California.



Picture of the numbers 760 identifying those apartment buildings that belong to 760 Givens Road, Red Bluff, California.



# ATTACHMENT A-3

Vehicle to be Searched: A 2006 Lexus sedan, silver in color, California license plate **7NNA919**, with a vehicle identification number of **JTHBK262465007289.**



# **ATTACHMENT A-4**

Vehicle to be Searched: A 2011 Honda, black in color, California license plate **7JVP459**, with a vehicle identification number of **1HGCP2F75BA114115**.



## ATTACHMENT A-5

<u>Vehicle to be Searched:</u> A 2006 Mercedes SUV, silver in color, California license plate **7KVR621**, with a vehicle identification number of **4JGBB86E76A032382**.



## **ATTACHMENT A-6**

<u>Vehicle to be Searched:</u> A 2009 Chevrolet Silverado pickup truck, white in color, California **8U14540**, with a vehicle identification number of **1GCEC24049Z140452.**



## ATTACHMENT A-7

Vehicle to be Searched:  A 2009 Toyota Camry, red in color, California license plate **8CUH181**, with a vehicle identification number of **4T1BE46K49U315542.**



# ATTACHMENT A-8

Location to be Searched: The entire land area on which a marijuana grow operation is located in the undeveloped area of Trinity County, California, at the approximate GPS coordinates 40 24.240N 123 7.606W, which is in the Shasta-Trinity National Forest, has been designated the **Telephone Ridge Marijuana Grow Site.** The search warrant authorizes the search of the entire marijuana grow operation site, any satellite sites attendant thereto, any campsites, marijuana processing areas, lookout posts, food and/or supply caches, garbage/trash areas, trail systems, and watering systems that are linked to the marijuana grow site by common trail and/or waterlines, including any and all temporary structures, including tents, lean-tos, sheds, shelters, storage areas, ice chests, containers, sleeping bags, clothing, backpacks, duffel bags, electronic devices, including cell phones, iPods, cameras and other devices used to store items, information, and photographs related to the manufacture of marijuana.

The Telephone Ridge Marijuana Grow Site is in a forested, mountainous area on the Shasta-Trinity National Forest. There are no established roads or trails leading directly to the marijuana grow site other than the temporary access trails established by the suspects occupying the clandestine marijuana grow site. An aerial photograph of the Telephone Ridge Marijuana Grow Site is attached below.



## ATTACHMENT B
## ITEMS TO BE SEIZED

The officers executing this warrant are authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"), committed by Fidel SANCHEZ-CRUZ, Abraham DE LOS SANTOS-SANCHEZ, Nancy EVELIN VILLENA-ARGUELLES, Cornelio CARRAZCO-VALENCIA, and their co-conspirators: Title 21 U.S.C. Section 841(a)(1) -- Manufacture of Marijuana; and Title 21 U.S.C. Sections 846 and 841(a)(1) -- Conspiracy to Manufacture Marijuana.

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which officers may search includes:

1.  Any controlled substances, including marijuana in all stages of processing and marijuana seeds;

2.  Any controlled substances paraphernalia, including rolling papers, cigarette packs, small medicine containers, glass and plastic vials, rolled up papers for holding seeds, sifters, scales, and other weighing devices, drying screens, pouches, backpacks, surveillance/monitoring devices, alarm sensors, storage containers, diluting or cutting agents, and packaging materials, including plastic baggies, large plastic garbage bags, boxes, buckets, tin foil, cellophane, jars, and heat sealers to package marijuana for sale;

3.  Any supplies, equipment, and tools associated with the manufacture of marijuana, such as electric generators, pumps, containers for growing marijuana plants, pots, starter cups, screens, clippers, trays, potting soil, fertilizer, hydroponic grow equipment, rockwool, timers, irrigation equipment and devices, funnels, fertilizer and water mixer-proportioners, garden sprayers, watering devices, water filters, boxes, backpacks, pouches, burlap bags, plastic bags, plastic storage containers, ground processing devices, herbicides, plastic tubs, buckets, pesticides, insecticides, drying screens, plastic sheeting, plastic tarps, large garbage cans, camouflage clothing, camouflage painted items, gloves (gardening, work, rubber, or plastic), camouflage or green/brown/earth/dark-colored paints, and checks and receipts for the purchase of such items;

4.  Clothing and gloves worn or intended to be worn during the conspiracy to manufacture marijuana, such as stained or contaminated clothing items with marijuana residue indicating the close contact or handling of marijuana, and earth tone and camouflaged clothing items;

5.  All items on which scientific testing for Deoxyribonucleic acid ("DNA") can be conducted, such as eating utensils, drinking containers, clothing, footwear, bedding, toothbrushes, combs, hair brushes, and other personal hygiene products

found in marijuana garden sites and campsites used by marijuana growers to help link a suspect back to a marijuana garden site or campsite;

6.  Items tending to identify the location where controlled substances, proceeds from the sale of drug trafficking, and other evidence of drug trafficking may be found, to include records and keys for vehicles, storage facilities, "drug stash houses", businesses, and safe deposit boxes;

7.  Devices, equipment and maps used to identify and/or mark potential sites and for land navigation, to include both tangible media and electronic media, such as GPS devices, maps, charts, drawings and written directions or instructions related to areas suspected of containing marijuana cultivation operations;

8.  Equipment and supplies used by marijuana manufacturers to live in outdoors areas near the marijuana garden sites, such as sleeping bags, bivy sacks, camping equipment, tents, shelters, stoves, propane tanks, fuel tanks, batteries, food, water containers, and lighting devices;

9.  Narcotics or money ledgers, narcotics distribution or customer lists, narcotics supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics were purchased, possessed, transferred, distributed, sold, or concealed;

10. Cellular telephones and other communication devices which could be used to participate in a conspiracy to manufacture and/or distribute controlled substances in violation of 21 U.S.C. § 841(a)(1);

11. Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics;

12. Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug manufacturing and trafficking activities;

13. Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashier's checks, and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

14. United States currency and foreign currency linked to the manufacture and/or distribution of controlled substances and/or the proceeds of the manufacture and/or distribution of controlled substances;

15.    Records, documents, and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances;

16.    Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the manufacture and/or distribution of controlled substances or discovered in the possession of a prohibited person;

17.    Devices used to conduct counter surveillance against law enforcement, such as radio scanners, police radios, night vision and/or infrared thermal imaging equipment, surveillance cameras and monitors, anti-bugging devices or transmitters, and/or receipts or literature describing the same.

18.    Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

19.    All names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the mobile telephone or on a server and associated with mobile telephones that are associated with SANCHEZ-CRUZ, DE LOS SANTOS-SANCHEZ, EVELIN VILLENA-ARGUELLES, and/or CARRAZCO-VALENCIA during execution of the warrant. This authority to search such mobile telephones includes the following within each mobile telephone:

    a. Incoming call history;
    b. Outgoing call history;
    c. Missed call history;
    d. Outgoing text messages;
    e. Incoming text messages;
    f. Draft text messages;
    g. Telephone book;
    h. Data screen or file identifying the telephone number associated with the mobile telephone searched;
    i. Data screen, file, or writing containing serial numbers or other information to identify the mobile telephone searched;
    j. Voicemail;
    k. User-entered messages (such as to-do lists);
    l. Photographs; and
    m. Any passwords used to access the electronic data described above.

## ATTACHMENT C

**FIDEL SANCHEZ-CRUZ** Washington driver's license from Officer Snyder's traffic stop on May 9, 2018.





WA USA **WASHINGTON**            **DRIVER LICENSE**

4d LIC# **SANCHF*201Q0**        8 CLASS
1 **SANCHEZ CRUZ**
2 **FIDEL**

3 DOB **11/20/1980**            4a ISS **09/19/20**
8 **5804 WESTPORT LN**
**PASCO WA 99301-9289**

15 SEX **M**              18 EYES **BRO**
16 HGT **5'-05"**          17 WGT **165 lb**
12 RESTRICTIONS          9a END **NONE**
        **NONE**        4b EXP **11/20/202**

5 DD SANCHF*201

**FIDEL SANCHEZ-CRUZ** at the drop point on June 7, 2018.



**FIDEL SANCHEZ-CRUZ** bringing supplies to the drop point on June 7, 2018 in the silver Mercedes.





Same silver Mercedes parked at the drop point on Telephone Ridge on July 31, 2018.



**FIDEL SANCHEZ-CRUZ** at Telephone Ridge drop point on July 31, 2018 carrying supplies towards the marijuana cultivation site wearing a light colored hat, a blue shirt with long gray sleeves and blue jeans.



**ABRAHAM DE LOS SANTOS-SANCHEZ** exiting the Mercedes on June 25, 2018 at approximately 2:32 a.m., on Telephone Ridge.



**ABRAHAM DE LOS SANTOS-SANCHEZ** walking south on Telephone Ridge towards Highway 36 on July 2, 2018 at approximately 1:54 p.m.



**ABRAHAM DE LOS SANTOS-SANCHEZ** walking north on telephone Ridge towards the marijuana cultivation site with **NANCY EVELIN VILLENA-ARGUELLES** on July 29, 2018 at approximately 11:49 a.m.



**NANCY EVELIN VILLENA-ARGUELLES's** Toyota Camry entering Telephone Ridge on July 13, 2018 at approximately 3:49 p.m.



**ABRAHAM DE LOS SANTOS-SANCHEZ** running south on Telephone Ridge towards
**NANCY EVELIN VILLENA-ARGUELLES** on July 13, 2018 at approximately 3:49 p.m.



**ABRAHAM DE LOS SANTOS-SANCHEZ** unloading plastic bags from **NANCY EVELIN VILLENA-ARGUELLES's** Toyota Camry on July 29, 2018 at approximately 11:40 a.m.



**ABRAHAM DE LOS SANTOS-SANCHEZ** and **NANCY EVELIN VILLENA-ARGUELLES** walking north towards the marijuana cultivation site on July 29, 2018 at approximately 11:49 a.m. Both subjects are carrying plastic bags that had just been unloaded from **NANCY EVELIN VILLENA-ARGUELLES's** red Toyota Camry.



**NANCY EVELIN VILLENA-ARGUELLES** walking north towards the marijuana cultivation site on July 29, 2018 at approximately 11:50 a.m.



**CORNELIO CARRAZCO-VALENCIA** at the drop point at approximately 9:24 a.m., on July 31, 2018.  I believe he is looking for surveillance equipment.





**CORNELIO CARRAZCO-VALENCIA** at the drop point at approximately 11:19 to 11:22 a.m., on July 31, 2018 watching my vehicle.









**CORNELIO CARRAZCO**-VALENCIA driving the silver Mercedes in reverse at the drop point at approximately 11:44 a.m., on July 31, 2018.

